UNITED STATES of America, Plaintiff,

v.

UNION CHEESE COMPANY,
et al., Defendants.

No. 5:95CV801.

United States District Court,
N.D. Ohio,
Eastern Division.

June 16, 1995.

Order Supplementing Injunction
July 12, 1995.

Michael Anne Johnson, Assistant U.S. Attorney, Cleveland, Ohio, Drake Cutini, Dept. of Justice, Office of Consumer Litigation, Washington, DC, and Nancy K. Stade, U.S. Food and Drug Admin., Rockville, MD, for Plaintiff.

Ronald L. Russell, Alliance, Ohio, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HEMANN, United States Magistrate Judge.

This matter came before the court on June 5, 1995 for trial on the Complaint for Injunction filed by the United States of America pursuant to 21 U.S.C. § 301 et seq. The government's motion for preliminary injunction was consolidated with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Having considered the testimony of the witnesses, the trial exhibits, the memoranda submitted on behalf of the parties, the arguments of counsel and the applicable law, the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Defendant Union Cheese Company ("Union Cheese") is a corporation organized under the laws of the State of Ohio. Union Cheese is engaged in the production and

distribution of swiss cheese and the distribution (including cutting and packaging) of other cheeses at its facility in Sugarcreek, Ohio. Union Cheese regularly ships cheese products outside of the State of Ohio. It receives milk shipments from outside of the State of Ohio. Union Cheese produces approximately 20,000 pounds of swiss cheese per day and regularly has 1,000,000 pounds of cheese on hand at its premises. Defendant Dominic Gangale is the president and sole shareholder of Union Cheese with responsibility for, and authority over, the management and day-to-day operations of Union Cheese. When Dominic Gangale is not present at the plant, defendant Annette Gangale assumes control of its operations.

On September 29 and 30, 1994 Food and Drug Administration ("FDA") Inspector Phillip M. Pontikos visited Union Cheese for the purpose of conducting a routine inspection. Pontikos testified to his observations on that date; his observations are memorialized in an Establishment Inspection Report (EIR) and FDA Form 483 [1] prepared at the time of the inspection. Pontikos noted the following objectionable conditions relevant to the government's claims in this action:

1. There was a dead insect on top of a block of swiss cheese in brine solution.

2. In excess of 30 dead flies were floating throughout the brine solution while cheese was in the solution.

3. Dead insects too numerous to count with cob webs and dirt were on window sills in the brine room.

4. The dock door and main entrance door leading into the brine room were left open. The largest concentration of dead insects in the brine tank were located on the side next to the open doors.

5. A bearded employee was not wearing a beard cover while removing cheese from the brine solution.

6. There was no hot running water in the men and women restrooms in the brine room or in the sinks in the laboratory room.

7. Cheese scraps dropped on the floor in the cutting room were left for at least 2 hours.

Photographs taken of the conditions observed by Pontikos confirm his observations. Pontikos discussed his objections with Annette Gangale, who agreed with most of them and further agreed to discuss the problems with Dominic Gangale.

Pontikos collected two blocks of swiss cheese from Union Cheese on September 30, 1994 and submitted the samples to the FDA District Office in Cincinnati, Ohio for analysis. Jan Marie Hunt, a microbiologist with the FDA, testified that composite samples of each block were prepared (# 075) and the samples tested in accordance with the method set forth in the Bacteriological Analytic Manual developed by the FDA especially for testing cheese products.[2] One of the subsamples tested positive for Listeria monocytogenes ("L. mono"). Union Cheese was notified of the finding and instructed to institute a recall and a subrecall (i.e. a notice to customers of the Union Cheese customer). The recall efforts undertaken by Union Cheese were incomplete because of poor coding on the cheese lots. Dominic Gangale admitted that he did not know to whom the contaminated cheese had been sold. As a result, the suspect cheese could not be traced.

On October 28, 1994 the FDA collected a cheese sample (# 408) from blocks sold to Fugazzi Cheese Co. in Cincinnati, Ohio. Tests were run on two composites. One subsample tested positive for L. mono. Union Cheese once again was instructed to undertake a recall. Dominic Gangale acknowledged that a broker for Union Cheese told Fugazzi that its cheese lots were not part of the recall.

On October 27 and 28, 1994 Pontikos made a limited inspection of the plant and collected

1. A Form 483 is a written summary of observations made by the inspector. A copy of the 483 is given to the facility, and the inspector discusses the various observations with the person in charge of the premises at the time of presentation. The discussion occurs at the end of the inspection. Thus the 483 is prepared within hours of the completion of the inspection.

2. Hunt verified all test results of the FDA which are discussed herein.

24 environmental swabs and 5 environmental samples from various areas throughout Union Cheese. The samples were sent to the FDA office in Cincinnati for testing. Because the environmental swabs used by Pontikos were outdated, the swabs were discarded. The environmental samples (# 443), however, were tested for L. mono and other listeria strains. L. mono was found in samples taken from liquid and flies from the brine tank as well as in material recovered from the floor next to a drain at the south end of the production room. Two other listeria species, listeria innocua and listeria grayi, were found in the floor material. During this inspection Pontikos found cheese which had been returned to Union Cheese because of mold. Of the 144 blocks of cheese returned, 44 showed mold. Annette Gangale told Pontikos that the mold would be cut off the end of the cheese and, after the cheese was tested for L. mono, the newly cut cheese would be repackaged for distribution.

On November 7, 1994 Pontikos conducted a follow-up inspection, collecting in-line (in production) and raw material samples (# 445) as well as environmental samples (# 444). With respect to the environmental samples L. mono was found on the outside surface of a wooden cheese box and in cheese trimmings from the floor. Listeria welshimeri was recovered from the floor in the cheese cutting area near a drain. Listeria innocua was recovered from the outside of the same wooden cheese box, the hands of an employee cutting cheese, a drain near a cheese cutter, the floor in the cheese cutting area near a drain, surfaces of a metal cheese cutter table, cheese trimmings and a drain near a cheese bagger. With respect to the in-line and raw material samples, L. mono and listeria innocua were found in raw milk in silo 1.

Pontikos and Steven Kilker, also an FDA Inspector, inspected Union Cheese on November 21, 1994 as a follow up on the recall process resulting from the discovery of L. mono in samples 408 and 443. At that time the inspectors were given copies of letters purportedly sent to Fugazzi Cheese Co. and Sysco/Continental in Indianapolis, Indiana, the consignees of the potentially contaminated cheese lots.

On November 29—December 14, 1994 Pontikos, Kilker and Frederick Lochner, another FDA inspector, conducted an investigation of the plant. Their EIR states:

Current inspection found deviations from food GMP's [Good Manufacturing Practices] which relate to microbiological control. The firm relies on aging of the cheese since the milk is not pasteurized. Raw and finished operations are not sufficiently separate. The cutting room is not operated in a sanitary fashion to prevent contamination of cheese in cutting and packaging. The firm was found to be shipping cheese before the required 60 day aging was completed. Labeling for all products checked was missing all or some of the required elements.

The Form 483 lists the following conditions:

1. There was condensate dripping onto exposed cheese from the ceiling during cutting of cheese.

2. Paint on the ceiling directly above the cutting table was peeling.

3. Water temperature in the sink in the cutting room and restroom was 60–70 degrees.

4. No soap was available at the handwashing sink in the cutting room.

5. The overhead door was left open during cheese cutting operations.

6. There are gaps along the side of the outside door near the cutting table and along the bottom of the door near the overhead door.

7. Hand cutting and scraping tools are not readily sanitizable (knives have wooden handles; some plastic handles have screws, nuts and washers; a rusty disposable knife with cheese residue on it is used for cutting through the wrapping on the blocks).

8. Cheese cutting tools are set on a table with a split surface on which "old product" is located.

9. The break area for employees and the restrooms are next to the brine tank where uncured cheese is handled. The employees who cut cheese walk through the brine tank room, through two dirty curtains and

through an outdoor area to get to the cutting room.

10. Because the cutting area is in a separate building from the production area, the cheese taken from the brine room must pass through the outside to be cut.

11. Employee restrooms open directly onto the brine room. Handles on faucets are "very corroded."

Further, the inspectors noted the following objectionable employee practices:

1. Cutting tables are sanitized before rather than after breaks. Sanitizing fluid residue remains on the tables.

2. The employee who handles the wooden crates and drives the towmotor to the cooler for uncut cheese also unwraps and halves the cheese and handles exposed cheese without washing and sanitizing his hands.

3. Employees handling the cheese in cutting and packaging cheese did not wash or sanitize their hands over a period of several hours. They also returned from breaks without washing and sanitizing hands.

4. Halving of the cheese is done above or next to the floor drain, about 6 inches off the floor, on the pallet on which it was stored.

5. Packaging dropped on the wet floor was placed on exposed cheese.

6. Employee hair restraints do not cover their hair completely.

7. Employees hang their aprons on the same racks with two aprons covered with mold.

The inspectors found problems in the cheese production area:

1. Swiss cheese made from unpasteurized milk was shipped before aging for 60 days.

2. Old rennet jugs with unchlorinated water are used as weights for pressing cheese. One of the jugs was leaking.

3. Drip vats are cleaned and then placed on the floor before being returned to the vats.

Inspection of the brine room revealed 60 dead insects on the surface of 10 blocks of cheese in the brine tank on December 2,

1994. Two live insects were seen in the production room. There was a hole approximately six feet by three feet in the ceiling. Once again, photographs taken at the time of the inspection confirm the observations.

The raw milk testing records were inspected and revealed that a significant amount of incoming milk had a high somatic cell count, indicating the likelihood of disease in the cows from which the milk was taken.

Swabs and environmental samples were collected on November 29, 1994 (463). L. mono was detected on the top surface of the cutting table, a recently used employee apron, a drain five feet from the cutting table and cheese trimmings from the floor.[3] Listeria innocua was found on the outside surface of the hydraulic unit for the plunger, the drain located near the cutting table and on a table near a radio. Environmental samples were collected on December 6, 1994. The tests on those samples revealed the presence of L. mono in brine from below the surface of the east end of the brine tank. Listeria innocua was found in milk from the surge tank, on the floor at the plastic strip door at the end of the brine room and in a puddle at the cooler entry door.

Gangale promised to correct some of the problems. He fired his plant manager as a result of some of the items found.

A court-ordered inspection was carried out during May 16–18, 1995. Product and environmental samples were collected (## 595 and 598). While no L. mono was detected, listeria innocua, listeria grayi, listeria seeligeri, listeria murrayi and listeria welshimeri were detected. In one subsample of brine and cheese material the following filth was recovered: nine adult flies, 3 pupa and 1 maggot identified as small dung flies.

The Form 483 from the May 1995 inspection reflects conditions previously reported on, including:

1. Surfaces were not sanitized after breaks.

2. Sanitizing solutions were mixed improperly.

---

**3.** Dominic Gangale testified that the cheese trimmings are packaged and sold as fish bait.

3. The company used tools and equipment which are not readily sanitizable.

4. Employees handled exposed cheese after touching non-sanitized surfaces and without washing their hands.

5. Employees in the cutting room dipped hands in water containing no discernible sanitizing agent.

6. Employees halved cheese blocks near the floor drains.

7. There was an employee with no beard cover.

8. Cheese made from raw milk was shipped prior to expiration of 60 day aging period.

9. The break area and restrooms open into the brine area so employees must cut through this area and through plastic curtains into the outside to enter the cutting area.

10. The water temperatures were low.

11. There are high somatic cell counts in raw milk.

12. Blocks of cheese in the brine tank had dead insects on them and dead insects were floating in the brine solution.

13. There were two holes (six feet by three feet and three feet by three feet) in the brine room ceiling.

14. Rain water leaked into the brine room.

15. Restroom faucets had corroded handles.

16. There was peeling paint and rusty ceiling and pipes over the cheese in the cutting room.

17. There was a hole in the bottom of the screen door in the cutting room.

18. There was a loose nut on a cheese wrapper.

19. There were five live birds in the truck bay.

20. There were two bird nests and a live bird in the brine room.

In attempting to deal with condensation Union Cheese placed a fan in the cutting room. The fan, however, has been placed in such a way that it draws air into the facility from the plant's sewage treatment plant. Photographs of the facility confirm the conditions.

The court finds that problems identified by the FDA as early as 1991 and 1992 and described in EIRs admitted as exhibits 53 and 55 had not been corrected by the 1994 and 1995 inspections.

Dominic Gangale is "semi-retired," spending approximately 40% of his time at the plant. He takes the position that L. mono cannot survive in the manufacture and production of swiss cheese and thus any problem with bacteria would be introduced in the cutting area. He disputes the FDA's findings of L. mono. Moreover, it is his position that L. mono is "everywhere" and if one tests long enough and hard enough, it will be found. He is not concerned about using milk with a high somatic cell count.[4] There is no employee training program in sanitary practices in place at Union Cheese. Gangale has never consulted with a sanitary engineer. An exterminator sprays on a weekly basis, and the company sprays for flies daily. Gangale dismissed the concern that insect infestation is a serious problem at the facility, although admitting that the brine tank is not protected from falling dead flies.[5] He also acknowledged that the screen door in the cutting room has plants growing through it. In fact, Gangale did not dispute that the conditions set forth in the EIRs, and detailed to him in the Form 483s, exist. Simply put, he does not accept the FDA's position that these problems violate GMPs required by law and are "filth" and "insanitary" under the law.[6]

4. A high somatic cell count is not bacteria and the cells are "spun out" during the clarification process.

5. Defendants' position appears to be, "You want the flies dead or alive? If you want them dead, we can't control where they are going to drop."

6. The court reviewed a videotape of the facility taken at Gangale's direction on April 28, 1995. The videotape is not persuasive. There were no employees working so employee practices were not taped. The court noted rennet jugs on the floor (jugs presumably used in the brine tank), an open dock door, wet floors throughout, and sunlight coming through the hole in the roof. There are no pictures of tools or the restrooms. In short, while the videotape may show a facility with state of the art equipment, it does not focus on the problems of concern to the FDA.

Joseph Michael Madden, Ph.D., Strategic Manager for Microbiology, Center for Food Safety and Applied Nutrition for the FDA, testified that L. mono is a pathogenic bacterium that can cause listeriosis. Listeriosis is a disease particularly threatening to persons with compromised immune systems (e.g. the elderly), to pregnant women and to the unborn and newborn. The disease, flu-like in symptoms, can be life threatening. L. mono can be food borne. The average onset period of the disease is 30–35 days with the range of onset being 2–92 days. This long onset period causes difficulties in finding the food vehicle. The level of L. mono bacteria required to cause illness is unknown. The organism reproduces at refrigerator temperatures and at temperature ranges below refrigerator ones. Dairy products are a major vehicle for transmission of the organism. The presence of L. mono in food is likely to be "sporadic" in nature; that is to say, it is rare to have contamination throughout a food substance. Birds can carry L. mono in their intestinal tracts. Flies are "vectors" for the organism, transmitting the bacteria from place to place.

Dr. Madden opined that the presence of bacteria at Union Cheese suggest that there could be bacterial contamination within the plant. As for cheese processed under those conditions, anything which comes into contact with L. mono can become contaminated. Insects serve as vectors for the bacteria. Contaminated cheese could cause illness on consumption. End product testing is not sufficient to test for L. mono because that approach is inefficient, costly and incomplete. Instead a company should use a hazard analysis approach, eliminating potential problems throughout the cheesemaking process.

Willie Fred Jackson and Christine Anderson of Accra Laboratories testified as experts for the defendants. Accra Labs performed tests on cheese samples on seven occasions from October 31, 1994 to December 15, 1994. The samples were selected and delivered to Accra Labs by Dominic Gangale. Accra Labs did not detect L. mono in any of the numerous samples it tested. Anderson testified that they did not test for any other listeria strains.

No tests were requested by Union Cheese from December 1994 (the last delivery having been made to Accra Labs on December 6) until May 1995. On May 18, 1995, at the completion of the FDA inspection, Jackson and his supervisor made a site visit to Union Cheese where they collected 13 in-line and environmental samples (the FDA had collected 53 samples). Jackson testified that Anthony Gangale, Dominic Gangale's son, told him which areas to sample. Dominic Gangale testified that the intent was to have parallel sampling with the FDA. There is no evidence that parallel samples in fact were taken. Accra Labs found no indication of L. mono in its samples.

Jackson testified that he had never inspected a cheese facility prior to May 1995. He was not given a copy of the FDA's Form 483 noting its concerns. He concluded that based on his experience, neither filth nor insanitary conditions was present. He did point out that employees handled cheese product with their bare hands and such could give rise to contamination. Jackson did not do a thorough inspection of the plant. For example, he did not inspect the restrooms or test the water temperature. He did not see certain equipment, did not observe the hole in the ceiling and did not observe the doorways with grass growing through them. Jackson candidly stated that he would have inspected more carefully if he had been told what the FDA inspectors saw and did.

Accra Labs tested all samples in accordance with the United States Department of Agriculture ("USDA") protocol for listeria, using prepackaged solutions and media. Dr. Madden, on rebuttal, testified that the USDA method is not as reliable as the FDA method when testing cheese for listeria. Among other problems identified by Dr. Madden the initial broth used by Accra Labs contains sodium chloride and antibiotics. The test sample is added to the broth to permit the growth of any organisms present in the sample. These additives, sodium chloride and antibiotics, can stress the organisms added to the broth and inhibit their growth, particularly if the organism is present in low numbers. If the organism is stressed or found in low numbers, there may be no growth of the

organism and the reader could report a false negative. The initial solution used by the FDA does not contain these additives, allowing the organisms to grow uninhibited. Thus tests run by the FDA will yield results which are more accurate and reliable.

Union Cheese has not tested any cheese since May 18, 1995.

Jackson and Anderson were credible witnesses. The problem is with the scope of their assignments, the limitations on the information they were given, the test procedures they used and their lack of experience with the manufacture and distribution of cheese. The court accepts the test results of the FDA as accurate.

Dr. Madden testified that L. mono found in cheese may have been introduced through unpasteurized milk or through the environment. Pasteurization kills L. mono. As an alternative to pasteurization, aging cheese for an appropriate amount of time will kill off low levels of listeria (i.e. levels at less than or equal to 100 colony forming units per milliliter) but may not kill off higher levels.[7] The subsample collected by Pontikos on September 30, 1994 and tested on October 5, 1994 tested positive for L. mono even though it had been aged almost 4 months. Based on the expert testimony, the L. mono could have been introduced from the environment into that sample after the production process was completed or could have survived the aging process because of the level at which it was present in the product during production. The L. mono found through the FDA tests could not have been introduced during, or as a result of, the sampling or testing processes.[8]

The identification of L. mono and other listeria strains within Union Cheese gives rise to the likelihood that there exists bacterial contamination within the plant and that cheese products processed under such conditions can become contaminated and cause severe illness in humans upon consumption. The failure of the FDA to find L. mono during the court ordered May 1995 inspection does not convince the court that conditions have been improved to prevent the presence of the bacteria given its sporadic nature. The fact that listeria strains other than L. mono were identified as recently as May 1995 indicates that Union Cheese is not adequately sanitized to prevent the growth of bacteria within the listeria genus, including L. mono.[9]

## CONCLUSIONS OF LAW

■ This court has jurisdiction over the subject matter and the parties. Cheese is a "food" within the meaning of 21 U.S.C. section 321(f).[10] Union Cheese is engaged in interstate commerce.

Section 331 prohibits the following acts:

(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.

\* \* \* \* \* \*

7. This conclusion, stated by Dr. Madden, is supported by Exhibit 1003 offered by Union Cheese. See Mahmoud M. Buazzi, Mark E. Johnson, and Elmer H. Marth, *Survival of* Listeria monocytogenes *During the Manufacture and Ripening of Swiss Cheese*, 75 Journal of Dairy Science 380, 385 (1992).

8. Union Cheese's suggestion that the cheese samples were not properly refrigerated during transportation to Cincinnati and that the test results are thus suspect is not supported by the evidence. The government's experts testified that bacteria in cheese kept at warm temperatures would grow more quickly. The proliferation of the presence of such other bacteria might make the identification of L. mono more difficult, however, L. mono would not be introduced into the sample because of the temperature.

9. Defendants make much of a USDA approval issued in April 1995 (defendants' exh. 1001). That approval, however, does not include approval for cheese, which was not requested by Union Cheese at that time. Moreover, the court notes certain USDA recommendations which parallel the FDA: # 3102 "Restrooms cannot open direct into the brine room. Vestibules will be required if approval for cheese is requested."; # 104 "Lunch rooms should not be located in processing or supply storage rooms."; # 107 "Keep sparrows out of the receiving room."; and # 118 "Exhaust from new fans in boiler room should be directed to the exterior of the plant, receiving room or another area other than the cheese make room."

10. All future section references are to Title 21.

(k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

Defendants are involved in introducing food and delivering food for introduction into interstate commerce. Further, defendants hold cheese for sale after shipment in interstate commerce.

█ The FDA claims that the cheese produced by Union Cheese is adulterated under section 342(a)(1) and (4). Pursuant to those provisions, a food is adulterated

(1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health; ... or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health....

The Federal Food, Drug and Cosmetic Act does not define "added" as found in section 342(a)(1). A definition can be extrapolated, however, from 21 C.F.R. section 109.3(c) and (d):

(c) A *naturally occurring poisonous or deleterious substance* is a poisonous or deleterious substance that is an inherent natural constituent of a food and is not the result of environmental, agricultural, industrial, or other contamination.

(d) An *added poisonous or deleterious substance* is a poisonous or deleterious substance that is not a naturally occurring poisonous or deleterious substance. **When a naturally occurring poisonous or deleterious substance is increased to abnormal levels through mishandling or other**

**intervening acts, it is an added poisonous or deleterious substance to the extent of such increase.**

(Bold added; italics in original.) Based on the evidence, the court concludes that L. mono is an "added" deleterious substance.

█ L. mono is not an inherent natural constituent of cheese. Instead, it is a result of environmental contamination.[11] Moreover, the evidence is clear that the level of L. mono is increased through intervening acts of humans during the cheesemaking process. Insanitary conditions, which are the intervening acts of humans, are sufficient grounds upon which to conclude that a deleterious substance has been "added." *Continental Seafoods, Inc. v. Schweiker*, 674 F.2d 38 (D.C.Cir.1982). The evidence of insanitary conditions presented by the FDA inspectors and the uncontroverted evidence that the presence of L. mono in cheese may render the cheese injurious to health persuades the court that Union Cheese has introduced or delivered for introduction into interstate commerce food which is adulterated.

█ In addition the cheese produced at Union Cheese is adulterated within section 342(a)(4) because "it has been prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." Actual contamination is not required; it is sufficient that there exists a reasonable possibility of contamination. *United States v. H.B. Gregory Co.*, 502 F.2d 700 (7th Cir.1974), *cert. denied*, 422 U.S. 1007, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975). The question of insanitary conditions is to be determined from the totality of the circumstances. *United States v. 1,500 Cases More or Less, Tomato Paste*, 236 F.2d 208 (7th Cir.1956). "Filth" is to be construed to have its usual and ordinary meaning. *United States v. Cassaro, Inc.*, 443 F.2d 153 (1st Cir.1971).

█ Defendants have argued that "insanitary" and "filth" have not been defined sufficiently in this case to put them on notice,

---

**11.** Dominic Gangale admitted as much when he testified that in his opinion L. mono is introduced into the cheese in the cutting room, i.e. post-production. If that is the case, then it cannot be deemed anything other than an environmental contaminant.

apparently taking the position that the conditions documented by the FDA inspectors, and explained to them repeatedly, do not fall into that category. This position is frivolous, if not unconscionable. The cheese is manufactured in a facility where bird nests have been built; a bird is flying around; flies, pupa and maggots are in the brine in which the cheese is floating; flies are on the cheese blocks and the window sills; employees do not have hot water to wash their hands and would have to turn on and off rusty faucets even if they did have hot water; employee aprons hang next to mold covered aprons; employees do not have appropriate hair coverings; rain water is running in through leaks and holes in the roof; peeling paint hangs over the brine tank; tools are incapable of being sanitized; sanitizing solution is improperly mixed and improperly used; and listeria organisms abound. It is indeed cheese manufactured in such insanitary conditions that it is highly likely to become contaminated with filth **and** be injurious to health.

■ The court does not accept any implication that defendants have decided to comply with the law. Many of the problems noted by the FDA inspectors in 1991 and 1992 continue. Conditions have not improved since September 1994 when this series of FDA inspections began. Despite evidence of the presence of L. mono, Union Cheese did no testing between December 6, 1994 and May 18, 1995 and none since May 18. Despite its knowledge that a court ordered inspection was to take place beginning on May 16, 1995, Union Cheese did not bother to remove bird nests from the brine room or flies from the brine tank, patch the roof, bring in a sanitary engineer, or undertake any of the numerous remedial efforts required. Dominic Gangale, even at trial, showed no concern with the FDA's findings and made no offer to undertake corrective action. Clearly Gangale even hindered the ability of his own experts to do parallel samples and fully inspect the facility by failing to inform them of the FDA's findings.[12]

This court has the authority to enter an injunction pursuant to section 332(a). The court finds that unless restrained by order of this court defendants will continue to violate the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331(a) and (k). Therefore, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

I. Defendants, Union Cheese Company, a corporation, and Dominic F. Gangale and Annette M. Gangale, individuals, and all of their officers, directors, agents, representatives, employees, attorneys, heirs, assigns, successors, and any and all persons in active concert or participation with any of them are hereby permanently restrained and enjoined under the provisions of 21 U.S.C. section 332(a) from directly or indirectly causing: (a) the introduction or delivery for introduction into interstate commerce of any article of food and (b) the receipt, manufacture, preparation, packing, distribution, or holding of any article of food, while it is held for sale after it or one or more of its components have been shipped in interstate commerce, unless and until:

A. Defendants have established and implemented adequate methods, facilities, and controls for receiving, manufacturing, preparing, packing, distributing, and holding articles of food in the facility to ensure that articles of food are not contaminated with Listeria monocytogenes (L. mono) bacteria, other pathogenic bacteria, or filth. Such methods, facilities, and controls shall specifically include, but shall not be limited to, the following:

1) thoroughly cleaning, sanitizing, renovating, and rendering defendants' facility and all equipment in it suitable for use in receiving, manufacturing, preparing, packing, distributing, and holding articles of food to preclude the contamination of the articles of food with L. mono, other pathogenic bacteria, or filth, and instituting procedures to continuously maintain the facility and equipment therein in such condition;

12. *Gangale also admitted to having been held in contempt of court and fined for failing to comply with a consent decree arising out of an Ohio EPA* action. *This is further indication of his recalcitrance.*

2) establishing a written sanitation control program for defendants' facility and all their food handling equipment that will ensure that the facility and equipment are continuously maintained in a sanitary condition so as to prevent the contamination of food with L. mono, other pathogenic bacteria, or filth;

3) assigning responsibility for the operation of the sanitation control program to a person who, by reason of background, experience, or education in sanitation work, is competent to maintain the facility in a sanitary condition;

4) developing a comprehensive sampling and testing plan that shall involve testing, on a routine basis, for L. mono on food contact surfaces, equipment, and other appropriate environmental sites throughout the facility and in in-process and finished cheese in accordance with timetables and methods acceptable to the FDA;

5) developing an adequate finished product coding system that will indicate the history of the swiss cheese, including the processing and cutting date;

6) establishing an employee training program to include, at a minimum, regularly scheduled training in sanitary food handling techniques, equipment maintenance, and personal hygiene practices for all Union Cheese Company employees;

7) validating the manufacturing process to demonstrate that there is no continuation of the potential for L. mono contamination at Union Cheese Company; and

8) developing an adequate remedial and recall action plan for use if another L. mono contamination problem is discovered.

B. Defendants have selected and retained a person other than an employee of Union Cheese Company who, by reason of training and experience, is qualified to make inspections of defendants' facility and such person makes one or more inspections of Union Cheese Company and certifies in writing to the FDA that adequate methods, facilities, and controls have been implemented to ensure that the preparation, packing, distribution and holding of articles of food in the facility will not result in the contamination of food with L. mono, other pathogenic bacteria, or filth;

C. Defendants have examined for L. mono contamination all articles of food on hand at the facility or otherwise in defendants' custody or control and have submitted to the FDA Cincinnati District Office a written report of such examination. Defendants shall conduct such examination under the supervision of, and in accordance with methods approved by, the FDA. The FDA may, as it deems necessary, make additional analyses and examinations of any articles of food to ensure that the articles are not adulterated. All articles of food found to be contaminated with L. mono, other pathogenic bacteria, or filth shall be destroyed under the supervision of the FDA and in a manner that complies with local, state, and federal laws. Defendants shall, as the FDA deems necessary, recall at their own expense any lot of cheese found to be contaminated with L. mono, other pathogenic bacteria, or filth. Defendants shall pay all expenses of such supervision, analyses, and examination by FDA at the rates specified in ¶ V;

D. Defendants have submitted a written report to the FDA Cincinnati District Office describing in detail all actions they have taken to ensure that articles of food received, manufactured, prepared, packed, distributed, and held at their facility are not contaminated with L. mono, other pathogenic bacteria, or filth, and have not been held under insanitary conditions; and

E. The FDA has notified defendants in writing that defendants appear to be in compliance with the requirements set forth in ¶ I, A–D.

II. After defendants have instituted all the methods, facilities, and controls required by ¶ I, A–D, and have complied with all the other requirements of ¶ I, defendants and each and all of their officers, directors, agents, representatives, employees, attorneys, heirs, assigns, successors, and any and all persons in active concert or participation with any of them, are permanently enjoined from directly or indirectly: (a) introducing or delivering for introduction into interstate commerce any article of food that is adulterated within the meaning of 21 U.S.C. section

342(a)(1) or section 342(a)(4) and (b) causing any article of food to become adulterated within the meaning of 21 U.S.C. section 342(a)(1) or section 342(a)(4) while such food or one or more of its components is held for sale after shipment in interstate commerce.

III. After defendants have instituted all the methods, facilities, and controls required by ¶ I A–D and have complied with all the other requirements of ¶ I, defendants shall select, in consultation with the FDA, an independent laboratory competent to test for L. mono bacteria. Thereafter, for a period of one year, and as frequently as specified by the FDA, or if L. mono bacteria are found in defendants' cheese, food processing, or storage environment after entry of this Order, for an additional year from the date of any such discovery and as frequently as the FDA deems necessary, defendants shall have such laboratory test for L. mono contamination samples of finished cheese product, in-process cheese, and samples from food contact surfaces and other sites within defendants' facility. All such articles tested, including the lots of cheese from which samples are taken, shall be held by defendants until they receive documents showing that the laboratory test results are negative for L. mono. The independent laboratory shall contemporaneously forward the analytical worksheets, test records, and results of all such testing to defendants and to the FDA Cincinnati District Office. Defendants shall, as the FDA deems necessary, certify to the FDA in writing that each lot of cheese produced by defendants was sampled, tested, and found to be negative for L. mono by the independent laboratory prior to sale.

IV. The FDA is authorized, as it deems necessary, to determine that the requirements of this Order have been met and that defendants are continuing to comply with those requirements; to inspect defendants' operations, including their facility at 1545 County Road 70, Sugarcreek, Ohio and any new sites of defendants' operations, any articles of food and equipment therein; to examine and copy all records relating to the manufacture, preparation, packing, distribution, or holding of foods; and to take photographs and to collect samples of any articles of food

or any operations. Such inspections shall be authorized upon presentation of a copy of this Order and appropriate credentials. The inspection authority under this paragraph is apart from, and in addition to, the authority to make inspections under 21 U.S.C. section 374. The costs of all such inspections and sample analyses shall be borne by the defendants at the rates specified in ¶ V.

V. Defendants shall pay the costs of the government's inspections, reviews, and analyses conducted pursuant to this Order at the standard rates prevailing at the time the activities are accomplished. As of the date of entry of this Order, these rates are: $50.72 per hour or any fraction thereof for any inspectional work; $60.79 per hour or fraction thereof for any laboratory or analytical work; $0.30 per mile for travel expenses; and $98.00 for subsistence expenses, where necessary. In the event that the standard rates generally applicable to FDA supervision of court-ordered compliance are modified, these rates shall be increased or decreased without further order of the Court.

VI. If at any time while this Order is in effect the FDA determines, and notifies defendants in writing, that adequate methods, facilities and controls used for receiving, manufacturing, preparing, packing or holding food at the defendants' facility are not in place to prevent articles of food from being contaminated with L. mono, other pathogenic bacteria, or filth, defendants shall immediately upon notification by the FDA: (a) recall, as the FDA deems necessary and at defendants' own expense, any lot(s) of cheese found to be contaminated with L. mono, other pathogenic bacteria, or filth; and (b) cease all receiving, manufacturing, preparing, packing, distributing, and holding of articles of food, unless and until:

A. The FDA has conducted subsequent inspections of defendants' facility and collected and analyzed additional samples as it deems necessary to determine that adequate methods, facilities and controls used for receiving, manufacturing, preparing, packing, distributing, and holding articles of food are in place to prevent the articles of food from being contaminated with L. mono, other pathogenic bacteria, or filth. The cost of all

such inspections and sample collections shall be borne by defendants at the rates set out in ¶ V; and

B. The FDA has notified defendants in writing that defendants appear to be in compliance with the Act and the terms of this Order.

VII. If any defendant violates this Order and is found in civil or criminal contempt thereof, such defendant shall, in addition to other remedies, reimburse plaintiff for its attorney fees, investigational expenses, and court costs relating to such contempt proceedings.

VIII. Defendants shall provide, by personal service or return-receipted mail, a copy of this Order to each officer, director, and employee of Union Cheese Company within 10 days of the date of entry of this Order by the Court and shall provide the FDA with an affidavit of compliance with notification within 30 days stating the fact and manner of compliance and identifying the names and positions of all persons so notified.

IX. Defendants shall post a copy of this Order in an employee common area at the Union Cheese Company facility within 10 days of the entry of this Order and shall ensure that this Order remains posted for a period of 30 consecutive days.

X. Defendants shall notify, in writing, the Director, FDA Cincinnati District Office, at least 30 days before any reorganization, dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in the ownership or structure of Union Cheese Company that may affect compliance obligations arising out of this Order. Defendants shall serve a copy of this Order on any prospective successor or assign at least 30 days prior to such sale or change in business and shall furnish the Director, FDA Cincinnati District Office, and plaintiff's attorneys with an affidavit of compliance with this paragraph at least 15 days prior to such sale or change in business.

XI. All notifications, correspondence, and communications to the FDA required by the terms of this Order shall be addressed to the Director, FDA Cincinnati District Office,

1141 Central Parkway, Cincinnati, Ohio 45202.

XII. All decisions specified in this Order shall be vested in the discretion of the FDA, which discretion shall be reviewed, if necessary, under the arbitrary and capricious standard of review set forth in 5 U.S.C. section 706(2)(A).

XIII. This Court retains jurisdiction of the action for the purpose of modifying this Order and for the purpose of granting such additional relief as may be necessary and appropriate.

### STIPULATED SUPPLEMENTAL ORDER OF INJUNCTION

The Court issued an Order of Injunction on June 16, 1995. The defendants have moved for relief from the Court's Order of June 16, 1995, stating their intention to cease all cheese manufacturing operations and expressing their desire to sell their uncut cheese presently on hand without first complying with the terms of the Order respecting the resumption of operations.

The Court finds it necessary to supplement the Order issued on June 16, 1995, to recognize defendants' desire to cease operations and to attempt to salvage their uncut cheese on hand. For this reason,

IT IS ORDERED, ADJUDGED, AND DECREED that:

I. Defendants may attempt to salvage the uncut cheese that they have on hand as of the date of the entry of this Supplemental Order in the following manner: Defendants shall examine such cheese in accordance with the procedures outlined in Attachment A hereto. Defendants shall conduct such examination under the supervision of, and in accordance with methods approved by, the Food and Drug Administration (FDA). FDA may, as it deems necessary, make additional analyses and examinations of any articles of food to ensure that the articles are not adulterated, after which FDA will promptly make a decision regarding whether such cheese can be marketed. All articles of food found to be contaminated with *L. mono,* other pathogenic bacteria, or filth shall be destroyed, at FDA's direction, under the supervision of

FDA and in a manner that complies with local, state, and federal laws. Defendants shall pay all expenses of such supervision, analyses, and examination by FDA at the rates specified in ¶V of the June 16 Order;

II. Cheese in defendants' possession that has already been cut may be sold for processing under plan submitted to and approved by FDA.

III. Defendants may distribute cheese that was received by them prior to June 16, 1995, and that has been manufactured by others and was wrapped when received by defendants, only where the cheese can be distributed by defendants in the same undisturbed wrapper in which received.

IV. Except as provided in ¶¶ I, II, and III above, defendants, Union Cheese Company, a corporation, and Dominic F. Gangale and Annette M. Gangale, individuals, and all of their officers, directors, agents, representatives, employees, attorneys, heirs, assigns, successors, and any and all persons in active concert or participation with any of them are hereby permanently restrained and enjoined under the provisions of 21 U.S.C. § 332(a) from directly or indirectly causing: (1) the introduction or delivery for introduction into interstate commerce of any article of food, or (2) the receipt, manufacture, preparation, packing, distribution, or holding of any article of food, while it is held for sale after it or one or more of its components have been shipped in interstate commerce, unless and until they have complied with this Court's Order of June 16, 1995.

V. All decisions specified in this Order shall be vested in the discretion of FDA, which discretion shall be reviewed, if necessary, under the arbitrary and capricious standard of review set forth in 5 U.S.C. § 706(2)(A).

VI. All provisions of this Court's Order of June 16, 1995, shall remain in full force and effect except where expressly modified by this Supplemental Order.

SO ORDERED.

## ATTACHMENT A

Under Paragraph I.C of the Order of Injunction dated June 16, 1995, the following requirements shall apply to the uncut 200 pound blocks of cheese that remain in the custody or control of defendants:

A.

1. Cheese may not be tested until it is 60 days old.

2. A lot of cheese shall equal one day's production of cheese.

*For each lot, sixty*

3. ~~Each~~ 200 pound block of cheese shall be sampled and tested for L. mono and filth. *For any lot consisting of fewer than sixty 200 lb. blocks, each 200 lb. block shall be tested, and as many shall be tested twice as needed to yield a total. sixty sample*

*may RWM*

4. Sampling of the cheese for testing shall take place on the premises of the defendants' facility, and shall be performed by appropriate representatives of the laboratory chosen by defendants to perform the testing.

5. Sampling and testing for L. mono must be according to the FDA Bacteriological Analytical Method (BAM), 7th Edition 1992, Chapter 10, as modified by the attached memorandum. Each sample used for testing must include cheese from the interior and the exterior of the 200 pound block of cheese. *RWM Mal*

*From each lot, six 200 lb. blocks shall be sampled and tested for filth.*

6. ~~Sampling and~~ Testing for filth must be according to the Official Methods of Analysis of the Association of Analytical Chemists (AOAC) 16th Edition 1995, Chapter 16, Method 16.3.03, AOAC Official Method 960.49 "Filth in Dairy Products."

7. If any sample of cheese if found to contain L. mono or filth, your client must (a) recall any part of the lot from which that sample came currently in distribution; and (b) destroy any part of the lot from which the sample came that is under his custody or control in a manner that complies with local, state, and federal laws. Such recall and destruction shall occur under FDA supervision.

8. Defendants shall submit to FDA a written report of their testing of the cheese. FDA may, as it deems necessary, perform or supervise additional testing of the cheese. Following the initial testing for L. mono and filth, receipt of a report of such testing, and any additional testing it deems necessary, FDA shall determine which, if any, lots of cheese may be distributed for human consumption. Approval by FDA of release of any lots of cheese for human consumption shall be conditioned upon the understanding between FDA and the defendants that none of this cheese shall be further processed by them prior to sale.

B. Alternatively, defendants may submit a plan to FDA for reconditioning the cheese by heat treatment and selling it for animal consumption or for selling the cheese for pasteurized ~~cheese produ~~ or heat treated cheese products.

**Michael Jay PULLIAM, Plaintiff,**

v.

**SHELBY COUNTY, TENNESSEE,
et al., Defendants.**

**No. 92–2354 M1/BRE.**

United States District Court,
W.D. Tennessee,
Western Division.

June 15, 1995.