**UNITED STATES of America,**
**Plaintiff,**

· v.

**BLUE RIBBON SMOKED FISH,**
**INC., et alia, Defendants.**

No. CV–01–3887 (CPS).

United States District Court,
E.D. New York.

Nov. 19, 2001.

Charles S. Kleinberg, United States Attorney's Office, Civil Division, Brooklyn, NY, Allison M. Harnisch, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, for plaintiff.

Russell K. Statman, Plattsburgh, NY, for defendants.

## MEMORANDUM AND ORDER

SIFTON, Senior District Judge.

The United States brings this action for injunction against defendants Blue Ribbon Smoked Fish, Inc. ("Blue Ribbon"), Jay A. Suttenberg ("Suttenberg"), Pablo Negron ("Negron"), and Susan Dozortsev ("Dozortsev") (collectively, the "defendants") under 21 U.S.C. § 332(a), the Federal Food, Drug and Cosmetic Act (the "Act"

or "FDCA"). Specifically, the United States seeks to enjoin the defendants from violating 21 U.S.C. § 331(a) and (k) by introducing into interstate commerce food (1) that is adulterated within the meaning of the Act or (2) that will become adulterated after shipment.

Defendants Suttenberg, Negron, and Dozortsev (collectively, the "individual defendants") move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint against them in their individual capacities. The United States moves pursuant to Fed. R.Civ.P. 56 for summary judgment in its favor, enjoining the defendants from further violations of the FDCA on the ground that there are no material issues in dispute.

For the reasons set forth below, the individual defendants' motion is denied, and the United States' motion is granted.

## BACKGROUND

The following facts are taken from the parties' submissions in connection with the present motions and are undisputed except as noted. For the purpose of the individual defendants' motion to dismiss the complaint, I assume the facts alleged in the complaint to be true. I will not consider any matters outside the pleadings submitted by either party and will not treat the individual defendants' motion as one for summary judgment. *See* Fed.R.Civ.P. 12(b)(6). For the purpose of plaintiff's motion for summary judgment, I assume that all uncontroverted Rule 56.1 factual assertions are not disputed. *See Titan Indemnity Co. v. Triborough Bridge & Tunnel Authority*, 135 F.3d 831, 835 (2d Cir.1998).

Blue Ribbon, a New York corporation, is engaged in preparing, processing, holding, and distributing a variety of seafood products, including brined fish, hot- and

cold-smoked fish products, and seafood salads. It's facility is located at 5901 Foster Avenue, Brooklyn, New York (the "plant"). All three individual defendants work at the plant, are co-owners of Blue Ribbon, and are corporate officers responsible for plant operations. Suttenberg is president and co-owner of Blue Ribbon with ultimate authority over the plant's operations. According to the complaint, his responsibilities include food processing, plant sanitation, product distribution, and implementation of Hazard Analysis Critical Control Point ("HACCP") plans necessary for controlling food safety hazards.[1] Negron is vice president and co-owner of Blue Ribbon. He was previously Blue Ribbon's president, and as vice president he supervises the day-to-day operations of the plant, which includes overseeing the processing of the seafood, as well as the processes of fish thawing, brining, and smoking. Dozortsev is the secretary and treasurer of Blue Ribbon and a co-owner. Her duties, like those of Negron, include supervising the day-to-day operations of the plant, including overseeing the processing of the seafood, preparing HACCP plans, and monitoring sanitation controls.

Plaintiff alleges that the U.S. Food and Drug Administration ("FDA") and the New York State Department of Agriculture and Markets ("NYSDAM") have documented, throughout the last seven years, insanitary conditions at the facility as well as defendants' failure to establish and implement adequate HACCP plans necessary to control food safety hazards. The FDA and the NYSDAM have documented (1) numerous insanitary conditions at the plant; (2) defendant's failure to implement appropriate HACCP plans; and (3) the presence of Listeria Monocytogenes ("L.monocytogenes"), a bacteria that causes disease, in certain smoked fish products and in the plant environment.

*Proper HACCP Plans*

Seafood processors are required to establish and implement HACCP plans pursuant to 21 C.F.R. § 123.6(b). HACCP is a management system designed to prevent the occurrence of potential food safety problems. According to FDA regulations, a processor of fish and fishery products is required to assess biological, chemical, and physical hazards at all stages of processing, from production of the raw materials, to procurement and handling, manufacturing, distribution and consumption of the finished products. After assessing the health and safety risks that each particular food presents, the processor must determine necessary steps to control the identified risks. 21 C.F.R. § 123.6(a) & (b). A specific analysis must be done for each fish or fishery product, unless the food safety hazards, critical control points, critical limits, and procedures to be followed are identical for two or more fish products. 21 C.F.R. § 123.6(b)(2). The processor is then required to document these analyses in HACCP plans, as well as keep records to document the monitoring of the actual values and observations obtained when fish processing. 21 C.F.R. § 123.6(c)(7).

During the August 2000 inspection, the FDA found that Blue Ribbon failed to comply with FDA regulations regarding HACCP plans. According to the FDA's Establishment Inspection Report ("EIR"), the inspection team noted that "the firm lacked a written HACCP plan, a process schedule, and process monitoring records for a lot of brined and dried salmon pieces, removed from bones, used to produce a batch of cream cheese & lox." Blue Rib-

---

**1.** In defendants' answer, defendants deny that Suttenberg is responsible for these areas and admit only that Suttenberg is president of Blue Ribbon and that he performs his duties at the plant in Brooklyn.

bon recalled this lot of cream cheese and lox[2] and promised to correct the HACCP deficiencies. In the follow-up inspection of January 2001, the FDA's EIR again noted HACCP deficiencies, stating, in part:

> The firm processes cold smoked Nova Salmon with an incomplete written HACCP Plan, incomplete Monitoring Records and Verification Procedures that do not document the accuracy of temperature measuring devices or Salometers used in the brining operation. There is no verification of raw materials (incoming fish) containing levels of microorganisms that will not produce food poisoning or other disease in humans, and the firm operates with inadequate HACCP controls. There is no written HACCP Plans for Nova Salmon Bits (produced from pieces of salmon removed from bones) or smoked Sea Bass.

The EIR detailed the specific deficiencies that the inspection team observed in the HACCP plans. The following problems were identified with the cold smoked Nova salmon HACCP plan: the plan was signed but not dated, as required by 21 C.F.R. 123.6(d); it erroneously listed scombrotoxin formation as a food safety hazard relating to salmon production; there was no critical limit for internal fish temperature; no time was specified for thawing frozen fish; no procedure was included for monitoring brine solution or fish temperature during brining; it was inconsistent with the firm's written procedure for brining;[3] there was no procedure to check the accu-

racy of thermometers, salometers, thermostats; and there was inadequate monitoring of critical control points. The EIR also detailed the lack of HACCP plans for Nova salmon bits and noted that this deficiency had been brought to Blue Ribbon's attention during the August 2000 inspection. It was also observed that Blue Ribbon did not have a written HACCP plan for smoked sea bass. These deficiencies were discussed with Suttenberg and Dozortsev.

Defendants do not dispute the FDA findings that the HACCP plans were inadequate or non-existent at the time of these inspections. The defendants maintain that, as of now, Blue Ribbon has implemented an effective HACCP plan, which the company now follows.

*Insanitary Plant Conditions*

Inspections of the plant were conducted in 1994, 1995, 1996, 1999, 2000, and 2001. According to Jerome G. Woyshner, Director, Investigations Branch, New York District, Northeast Region of the FDA, Department of Health and Human Services ("Woyshner"), the FDA conducted the most recent plant inspection from January 17 to 26, 2001. The January 2001 inspection revealed the following insanitary conditions: old seafood product residue on food contact surfaces; mold in the cooler, freezer, and ceiling of the slicing and packing room; a plastic dividing curtain that touched the floor and came into contact with fish; liquid dripping onto sea-

2. The press release that announced the product recall stated, in part:
> It was revealed during FDA laboratory testing that [the implicated lots] may have the potential to be contaminated with Listeria monocytogenes, an organism which can cause serious and sometimes fatal infections in young children, frail elderly people, and others with weakened immune systems. Although healthy people may suffer only short-term symptoms, such as high fever,

severe headache, nausea, abdominal pain and diarrhea, listeria infection can cause miscarriages and stillbirths among pregnant women. To date there have been no reported illnesses.

3. Specifically, the HACCP plan states brining time is four hours, and the firm's written procedures and monitoring records indicate brining time to be six hours.

food from other seafood stored above; and old dripping product residue on the walls and fan shrouds in the cold smoking/drying room. The inspection found the inadequate cleaning and sanitizing processes, including a failure to adequately sanitize and wash cutting boards, knives, and slicing machine. The inspection also revealed employees touching unclean surfaces and then touching ready-to-eat fish without sanitizing their gloves, wearing street cloths in the processing areas without protective coverings, eating and drinking in the processing areas, inadequate hand washing and sanitizing, and wearing of unrestrained hair and beards. The FDA also found that the plant's construction was not designed to prevent bacterial contamination and filth and that there were inadequate doors or barriers between the slicing and packing room and the garage and toilet, lack of control over foot traffic and product flow to prevent cross-contamination of the finished ready-to-eat product and that surfaces were in disrepair making adequate cleaning impossible.

In August 2000, the FDA conducted two inspections and found insanitary plant conditions. For instance, the ceiling in the processing room was in disrepair and rusted; condensation was dripping from the ceiling into uncovered tanks of brining fish; dried encrusted food residue was observed in processing and packing areas; and used, stained boxes for receiving raw fish were stacked on top of the table in the packing area and on top of a refrigerator. On January 12, 2000, the NYSDAM issued a final determination, based on various inspections and product sampling, revoking Blue Ribbon's food processing establishment license. After subsequent satisfactory testing and sampling by NYSDAM, Blue Ribbon was reissued its license. A joint inspection conducted by the FDA and NYSDAM in October 1999 observed an employee drop a fish on the floor that then continued to be processed, a piece of cardboard and plastic tubing hanging into a brining tank, and the ceiling in disrepair and rusted. Earlier inspections in 1994, 1995, and 1996 found similar insanitary conditions and poor employee practices.[4]

Defendants do not dispute that the insanitary conditions observed by the FDA existed during the prior seven years of documented inspections. Defendants allege, however, that, since Suttenberg became president of Blue Ribbon on August 24, 2000, conditions at Blue Ribbon have improved. After the January 2001 inspection, Suttenberg wrote to the FDA outlining thirty corrective actions that Blue Ribbon would take to correct the conditions that had been observed. According to Suttenberg, Blue Ribbon has upgraded its physical plant, a wall has been constructed segregating the slicing area, seams in the cold smoking room were sealed and repaired, and the cutting table was replaced with a seamless frame unit. Plant walls were reinforced, and a new thermometer was installed to ensure the accuracy of existing thermostats that monitor fish temperatures. In addition, Suttenberg states that all cooler and freezer doors were painted and are scrubbed daily to keep them clean. Sanitary footpads are

4. Based on the January 1994 inspection, the FDA issued a warning letter to Blue Ribbon on March 2, 1994. The warning letter documented insanitary conditions, such as live cockroaches in the customer pickup and loading areas, existence of standing water, dried and encrusted fish on racks and fans, deeply scored cutting boards, the failure of employees to properly wash their hands, whole raw salmon on the floor awaiting processing, and the presence of L. monocytogenes. On March 30, 1994, defendant Negron, as vice president, responded to the warning letter and detailed several corrective actions to be taken.

placed at all entry points into the plant. Restrooms have been moved, new tile installed, and walls have been constructed to isolate the restrooms from the processing areas. Blue Ribbon has also designated an employee to be responsible for supervising sanitation.

### Presence of L. Monocytogenes

During inspections of the plant, the FDA found instances of L. monocytogenes contamination in seafood products and in the plant environment. According to the government, L. monocytogenes is a bacterium that causes the disease listeriosis, and food contaminated with this bacterium is harmful to human health. Listeriosis can be serious and even fatal for high-risk groups such as infants, the elderly, pregnant women, and those with impaired immune systems. The most serious consequence of infections in susceptible individuals is septicemia, a condition in which bacteria enter the bloodstream and multiply, thereby poisoning the bloodstream. Complications in pregnant women include miscarriage, stillbirth, bacteria in the bloodstream of the newborn, and meningitis. In other susceptible children and adults, complications commonly include problems with the central nervous system, pneumonia, endocarditis, localized abscesses, skin lesions, and conjunctivitis. Although listeriosis can be treated with antimicrobial drugs, it can be fatal, and for susceptible individuals who become infected, the mortality rate is between 20 and 30 percent.

In recognition of the health risk associated with listeriosis, the FDA has adopted a "zero-tolerance" policy with regard to L. monocytogenes and has established procedures for fish processors to follow to eliminate and control its presence in food. According to the government's expert, Mary E. Losikoff, FDA Consumer Safety Officer, a processor must test incoming raw materials for the presence of the bacteria, implement and follow strict sanitation measures, conduct environmental monitoring, and implement testing of the finished product. These steps are required particularly in the processing of cold-smoked fish, which are not subjected to heat sufficient to eliminate L. monocytogenes. In addition, as discussed above, a processor must have and follow HACCP plans.

Defendants dispute the seriousness of the risk that small amounts of L. monocytogenes poses to human health. They note that the bacteria does not ordinarily present a risk to healthy individuals, noting that the United Nations Food and Agriculture Organization ("UNFAO") records the incidence of disease associated with the bacteria as of approximately two to ten cases per million people and that epidemiological studies show a 1 in 59 million chance of infection from a 50 gram serving of fish containing 100 bacteria per gram. While L. monocytogenes is frequently found in fish, there have been few instances of listeriosis from fish products. At least one group of researchers has stated that "[l]isteria contaminated fish products should not represent a serious impact on human health."

FDA inspections at the plant revealed the presence of L. monocytogenes in food samples and in the plant environment. During the January 2001 inspection, FDA analysis revealed the bacteria in a sample of Nova salmon bits and in floor drains in a processing area of the plant. During the August 2000 inspection, FDA analysis revealed the presence of L. monocytogenes in a sample of sliced smoked Nova salmon and a sample of cream cheese and lox, as well as on the plant floor near the brining cooler. The NYSDAM inspection at the same time found samples of whitefish salad and smoked baked salmon salad contaminated with L. monocytogenes. On the ba-

sis of the FDA and NYSDAM findings in August 2000, Blue Ribbon recalled implicated lots of cream cheese and lox, frozen sliced Nova salmon, frozen deli-cut Nova boards, smoked whitefish salad, and smoked basked salmon salad. During the October 1999 joint inspection by the FDA and NYSDAM, samples of whitefish salad and smoked sable were contaminated with L. monocytogenes, as well as the cleaning room floor. In November 1999, Blue Ribbon recalled fish lots that were found to be contaminated. The FDA and NYSDAM found similarly contaminated food and plant environment samples in September 1999, November 1996, November 1995, and January 1994.

Defendants do not dispute that the FDA and NYSDAM found L. monocytogenes in food samples and in the plant. The defendants dispute that Blue Ribbon caused the contamination and suggest that L. monocytogenes is widely present in the environment, occurs naturally on raw fish, and is a problem faced by every fish processing facility, not just Blue Ribbon. Defendants point to a 1997 FDA study which found that 17.5 percent of cold-smoked fish products sampled nationwide between 1991 and 1995 tested positive for L. monocytogenes. That study found L. monocytogenes in ten of sixteen New York smoked fish processing plants. Other studies and surveys indicate that the FDA study was not an anomaly: a survey of vacuum-packed processed meats in retail stores found 53 percent of samples contaminated with the bacteria; vegetables have been found contaminated with the bacteria; and another study of food samples in the United Kingdom found an incidence rate of 6 percent. One article states that, once bacteria has contaminated the fish, contamination during subsequent processing becomes almost impossible to control, even with stringent sanitation procedures in place. Recalls of contaminated fish are not infrequent, and according to the UNFAO, between 1987 and 1992 there were 970 recalls of ready-to-eat foods from 109 firms in the United States.

In addition to occurring naturally in some raw fish, defendants also argue that it is impossible to prevent the presence of some amount of L. monocytogenes bacteria on cold-smoked fish. Lox, for example, is produced by the cold-smoking process and is not prepared by being subjected to sufficient heat to destroy L. monocytogenes. Rather, smoked salmon subjected to sufficient heat would not be recognized by consumers as lox. In light of this, defendants dispute that the FDA's "zero-tolerance" with respect to L. monocytogenes policy is appropriate. The UNFAO has taken the position that "[a]pplying a strict zero tolerance policy for this organism would effectively put a number of products out of the market, such as pre-cooked shrimp and smoked fish." Many European countries and Canada have set tolerance levels graduated with the health risk posed by the contamination.

Furthermore, defendants dispute that there are ongoing problems of L. monocytogenes contamination at the plant. NYSDAM tested Blue Ribbon samples on April 2, 2001, April 30, 2001, May 10, 2001, June 6, 2001, and August 21, 2001. NYSDAM did not notify the defendants of any contamination.

### Proposed Judgment Ordering Permanent Injunction

The United States has proposed terms of a permanent injunction to be entered should it prevail on its motion for summary judgment and defendants are found to have violated Sections 331(a) and 331(k) of the FDCA. First, defendants and all directors, officers, agents, representatives, employees, successors, assigns, attorneys, and any and all persons in active concert

with the defendants would be permanently restrained from the processing, preparing, packing, holding, and distributing of food at the plant or at any other locations unless and until certain conditions are met. These conditions include the following:

(1) Defendants must thoroughly clean and sanitize the plant and make certain structural changes to prevent condensation from dripping onto food;

(2) Defendants must select a person, other than an employee of Blue Ribbon, to act as a "Listeria expert" who is qualified to develop a testing program, a Sanitation Standard Operation Procedure ("SSOP"), employee training procedures, and a monitoring protocol, to detect, prevent, and control the introduction and spread of L. monocytogenes in the plant environment and in the raw ingredients and processed food products, especially for food products that will not receive a heat process (like cold smoked fish products);

(3) The United States Food and Drug Administration ("USDA") must approve the raw ingredient testing and treatment program, SSOP, training program, and monitoring program developed by the Listeria expert;

(4) Defendants must, under FDA supervision and by a method detailed by the proposed permanent injunction,[5] examine all lots of smoked and brined fishery products on hand at the plant for L. monocytogenes;

(5) For any fish or fishery products for which there is no HACCP plan, defendants must conduct a hazard analysis and develop a plan, which is to be approved by the FDA; and

(6) Prior to resuming operations, the FDA must notify defendants in writing that they are in compliance with all requirements set forth by the proposed injunction and 21 C.F.R. Parts 110 and 123.[6]

Once defendants meet the above conditions and the FDA certifies that the defendants are in compliance with the requirements of 21 C.F.R. Pts. 110 and 123, the plant may resume operations, subject to additional conditions. These conditions require that the defendants implement and maintain a protocol to control the presence of L. monocytogenes. The protocol must include a program for treatment or testing of susceptible raw materials for food products, such as cold-brined or cold-smoked fish that do not receive a heat treatment sufficient to kill the bacteria. Similarly, the protocol must include effective and diligent sanitation procedures, environmental monitoring, and additional controls to monitor the finished product after processing. The FDA will be permitted to inspect the plant, without prior notice to defendants, to ensure continuing compliance with the permanent injunction. Pursuant to the proposed injunction, this inspection authority would be apart from,

---

5. Specifically, the defendants would be required to select an FDA-approved laboratory to perform the L. monocytogenes testing, and the FDA must receive written reports detailing the laboratory results within two days after the defendants receive the results. The FDA would be authorized to conduct additional analyses and examine food products and raw ingredients as it deems necessary. Any fishery products that contain L. monocytogenes would have to be destroyed or reconditioned under FDA supervision. All FDA expenses relating to supervision, analyses, and examination shall be bourne by the defendants, at rates specified in the proposed permanent injunction.

6. 21 C.F.R. Pt. 110 details guidelines for "current good manufacturing practice in manufacturing, packing, or holding human food," and 21 C.F.R. Pt. 123 relates to fish and fishery products.

and in addition to, the FDA's authority to inspect, granted by 21 U.S.C. § 374.

By the terms of the proposed injunction, in the event that the defendants and/or their agents violate Section 331(a) or (k) of the FDCA, defendants shall immediately cease the processing, preparing, packing, holding, and distributing of food. Likewise, defendants must cease production if the FDA notifies them in writing that any article of food at the plant is adulterated, that there appear to be insanitary conditions at the plant, or that the defendants are not in compliance with the terms of the injunction, FDA regulations, or the FDCA. If the FDA deems it necessary, the defendants must also recall all articles of their products, and all costs of such a recall must be borne by the defendants. In the event that the FDA requires defendants to cease production, they may not resume until the FDA certifies that the defendants are in compliance with the terms of the injunction, FDA regulations, and the FDCA.

The proposed injunction provides that all decisions specified shall be vested in the discretion of the FDA and that the decisions will be final, subject only to review by this Court under the arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A). No discovery may be had by either party. The United States as plaintiff shall recover the costs of the present action, including attorneys fees, and the costs of any subsequent action necessary to enforce the terms of the injunction, should it prevail.

## DISCUSSION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 21 U.S.C. § 332, the latter providing district courts with jurisdiction, for cause shown, to restrain violations of 21 U.S.C. § 331.

### *Individual Defendants' Motion to Dismiss*

■ The individual defendants assert that the present action against them for an injunction is improper because they are distinct from Blue Ribbon, which is the corporate entity that should be the sole focus of the government's injunction, and because the complaint does not state a claim against them. A motion under Rule 12(b)(6) should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

■ The Supreme Court has established that "the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors." *United States v. Park,* 421 U.S. 658, 671, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (citations and internal quotation marks omitted). Food processing companies, and not consumers, are best positioned to protect public health: "Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless." *United States v. Dotterweich,* 320 U.S. 277, 285, 64 S.Ct. 134, 88 L.Ed. 48 (1943). The responsibility rests on the corporate entities, as well as its agents, and as such the FDA's statutory authority empowers the government to seek relief

against executives, as well as legal entities, in enforcement action. *See United States v. Undetermined Quantities of Articles of Drug,* 145 F.Supp.2d 692, 694 (D.Md.2001) (citing *Park,* 421 U.S. at 672, 95 S.Ct. 1903). "[C]orporate agents vested with the responsibility, and power commensurate with that responsibility, to devise whatever measures are necessary to ensure compliance with the Act bear a 'responsible relationship' to, or have a 'responsible share' in, violations." *Park,* 421 U.S. at 672, 95 S.Ct. 1903.

Thus, to state a claim against the individual defendants, the government must allege in the complaint that Suttenberg, Negron, and Dozortsev had responsible relationships to, or responsible shares in, the furtherance of the transactions outlawed by the Act.

According to the complaint, Suttenberg is Blue Ribbon's president with "ultimate authority" and is "in charge of overall operations of Blue Ribbon." Negron is Blue Ribbon's vice president and "manages and supervises day-to-day operations of the firm, including food processing, product thawing, brining, and smoking processes." Dozortsev is secretary and treasurer and "manages and supervises day-to-day operations of the firm, including monitoring food processing, preparing HACCP plans, and monitoring sanitation controls." Assuming the facts of the complaint to be true, the government has set forth facts that establish that corporate officers Suttenberg, Negron, and Dozortsev are responsible for the sanitation of the plant and the safety of the food it produces.

The individual defendants argue that an injunction against corporate officers is unnecessary where there is an injunction against the corporate entity, because agents are generally bound by restrictions placed on the principal. Nevertheless, courts have enjoined corporate officers in

civil cases brought under the FDCA, when the corporate entity was likewise enjoined. *See United States v. Universal Management Serv. Inc.,* 191 F.3d 750 759 (6th Cir.1999) (applying *Park* and *Dotterweich* to an FDCA injunction case against corporate office due to supervisory and managerial role); *cert. denied,* 530 U.S. 1274, 120 S.Ct. 2740, 147 L.Ed.2d 1005 (2000); *Undetermined Quantities of Articles of Drug,* 145 F.Supp.2d at 694 (enjoining company president who had responsible relationship to or responsible share in FDCA violations, despite assertions that he did not personally participate in manufacture, sale, or distribution of adulterated articles); *United States v. Sene X Eleemosynary Corp.,* 479 F.Supp. 970, 976–77 (S.D.Fla. 1979) (individual defendants' positions of authority and responsibility in the operation states a claim under the FDCA against them). While an injunction against corporate official might appear to the individual defendants to be duplicative, the Supreme Court has stated: "The requirements of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntary assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them." *Park,* 421 U.S. at 672, 95 S.Ct. 1903.

The individual defendants' motion to dismiss the complaint against them is denied.

### Government's Motion for Summary Judgment

Plaintiff has moved for a summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment must be granted if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a

matter of law. *See* Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any disputed material facts, and the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). While the court views the evidence in the light most favorable to the nonmoving party, *see O'Brien v. National Gypsum Co.*, 944 F.2d 69, 72 (2d Cir.1991), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."

The FDCA, Section 331 of Title 21 of the United States Code, prohibits:

> (a) The introduction or delivery for introduction into interstate commerce of any food ... that is adulterated or misbranded.

> (k) [T]he doing of any ... act with respect to [ ] a food ... while such article is held for sale ... after shipment in interstate commerce and results in such article becoming adulterated or misbranded.

21 U.S.C. § 331(a) & (k). The elements for establishing a violation of either of these provisions are essentially the same: (1) the product in question must be a food; (2) the food must be adulterated; and (3) there must be an interstate commerce nexus. The only difference between subsections (a) and (k) of Section 331 is the timing of the interstate commerce element: Section 331(a) prohibits introducing adulterated food into interstate commerce after processing, while Section 331(k) prohibits adulterating food after its components have traveled in interstate commerce. I address these three violation elements in turn.

### Defendant's Products are "Food"

■ The FDCA defines "food" as "(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article." 21 U.S.C. § 321(f). Under the FDCA, a court may take judicial notice that an article is food where it is common knowledge that the article is used for food. *United States v. H.B. Gregory Co.*, 502 F.2d 700, 704 (7th Cir.1974); *United States v. O.F. Bayer & Co.*, 188 F.2d 555, 557 (2d Cir.1951). Moreover, defendants do not dispute that the fish products it processes and distributes are food.

### Nexus to Interstate Commerce

The FDCA defines interstate commerce as "commerce between any State or Territory and any place outside thereof." 21 U.S.C. § 321(b). The FDCA also provides that "[i]n any action to enforce the requirements of [the FDCA] respecting a food ... the connection with interstate commerce required for jurisdiction in such action shall be presumed to exist." 21 U.S.C. § 379a. The government, in addition, has submitted evidence to establish that Blue Ribbon receives raw fish to be processed from Norway, Chile, and the Faroe Islands. Blue Ribbon ships its finished product to retailers in New Jersey and Pennsylvania. Moreover, defendants do not dispute that it is engaged in interstate commerce.

### Adulteration of Defendants' Products

It is a violation of the FDCA to move in interstate commerce food that has become adulterated. Food is adulterated as defined by the FDCA:

> (1) [i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adul-

terated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health[; or]

(4) [i]f it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.

21 U.S.C. § 342(a)(1) & (4). According to the United States, defendants' products are adulterated pursuant to this definition on the basis of three alternative grounds. First, plaintiff alleges the food is adulterated as defined by Section 342(a)(4) because defendants had an inadequate HACCP plan for smoked Nova salmon and had no HACCP plans for Nova salmon bits and smoked sea bass. Second, plaintiff alleges that the FDA's and NYSDAM's continued observance of insanitary conditions at the plant, including but not limited to the detection of L. monocytogenes at the plant, demonstrates that defendants' seafood may have become contaminated with filth or otherwise rendered injurious to health pursuant to Section 342(a)(4). Plaintiff alleges a third and independent basis of adulteration pursuant to Section 342(a)(1) due to the presence of L. monocytogenes in defendants' seafood, alleged to be a "poisonous or deleterious substance which may render it injurious to health." Because the absence of a dispute of material facts presented by any one of these allegations will support plaintiff's motion for summary judgment, I will address each basis of adulteration in turn.

■ 1. *Lack of an HACCP Plan.* The FDA regulations that establish the requirements of the HACCP plan states that the "[f]ailure of a processor to have an implement a HACCP plan that complies with this section whenever a HACCP plan is necessary . . . shall render the fish or fishery products of that fishery of that

processor adulterated under section [342(a)(4)] of the [FDCA]." 21 C.F.R. § 123.6(g). The government alleges that the HACCP plan deficiencies observed and reported by the FDA during August 2000 and January 2001 allow, as a matter of law, this Court to find Blue Ribbon's food adulterated under the FDCA.

Defendants do not dispute that the FDA has observed, documented, and warned Blue Ribbon and the individual defendants about the problems with the existing HACCP plan for smoked Nova salmon and the problematic lack of HACCP plans for Nova salmon bits and smoked sea bass. Defendants argue, in sum, that Blue Ribbon has in fact "implemented an effective HACCP Plan," which is "effective and followed by Blue Ribbon." Furthermore, defendants complain that "[i]f the Government means to allege that the HACCP Plan is somehow deficient, it has not specified what is wrong with it. Dozortsev, who is HACCP-certified, confirms that it is effective as implemented."

Defendants provide this Court with two HACCP plans, which Dozortsev declares are currently effective. Even a cursory inspection reveals these are the same HACCP plans in effect at Blue Ribbon at the time of the January 2001 inspection and found to be inadequate by the FDA. One plan is labeled cold-smoked fish and one is labeled hot-smoked fish. In handwriting on the former HACCP plan, someone has written "Product: salmon—nova." On the hot smoked fish HACCP plan, unidentified handwriting identifies the plan as operating as to whitefish, chubbs, whiting, trout, winter carp, and butter fish.

As discussed in some detail above, in August 2000, the FDA found Blue Ribbon did not have a HACCP plan for Nova salmon bits, and Blue Ribbon promised to correct this deficiency and implement a written HACCP plan. By January 2001,

Blue Ribbon had not implemented a HACCP plan for Nova salmon bits. At the time Dozortsev provided the current HACCP plans to this Court by declaration dated October 12, 2001, there was still no HACCP plan for Nova salmon bits. The FDA also observed, documented, and discussed with defendants the need for an HACCP plan to cover the processing of smoked sea bass. The HACCP plans provided to this Court do not encompass sea bass. Neither was the smoked Nova salmon HACCP plan amended in any way in response to the FDA's January 2001 inspection which revealed a number of critical deficiencies in the current HACCP plan, even though the FDA was assured by Suttenberg that Blue Ribbon promised to correct all HACCP plan violations.[7] Defendants' claims that they are unaware as to the nature of any HACCP plan deficiencies is both incredible and irrelevant, given the content of the FDA inspection reports from August 2000 and January 2001, defendants' "promise" to undertake the plans' corrections, and the absence of any scienter requirement in the relevant regulations.

Because the defendants' HACCP plans are inadequate and do not comply with the FDA regulations, the food Blue Ribbon processes pursuant to them is adulterated as a matter of law, as defined by Section 342(a)(4) of the FDCA. However, because the scope of an injunction entered against Blue Ribbon to remedy FDCA violations may vary depending on the nature of adulteration of defendants' seafood, I next consider the government's other two bases for asserting adulteration.

 2. *Insanitary Plant Conditions.* The government also contends that defendants' seafood is adulterated under 21 U.S.C. § 342(a)(4) because the undisputed facts show insanitary conditions and practices. A food is deemed adulterated under 21 U.S.C. § 342(a)(4) if "processed under insanitary conditions, whether [the food has] actually ... become dangerous to health or not." *United States v. 1250 Cans, Pasteurized Frozen Whole Eggs,* 339 F.Supp. 131, 140 (N.D.Ga.1972); *see also United States v. Nova Scotia Food Prod. Corp.,* 568 F.2d 240, 247 (2d Cir.1977) ("[F]ood does not have to be actually contaminated during processing and packing but simply [shown] that 'it may have been rendered injurious to health,' § 342(a)(4), by inadequate sanitary conditions of prevention."). To prove adulteration under Section 342(a)(4), the government must show a "reasonable possibility" that, by virtue of the insanitary conditions under which the food is prepared, packed, or held, an article of food may have been rendered filthy or injurious to health. *See Berger v. United States,* 200 F.2d 818, 821 (8th Cir.1952) ("The condition condemned by the statute ... is one which would with reasonable possibility result in contamination."); *United States v. H.B. Gregory,* 502 F.2d 700, 704–05 (7th Cir.1974) ("[T]he definitive 'reasonable possibility' test [is] now generally accepted in cases involving adulterated food under § 342(a)(4)."). The word "filth," as used in the statute, has

7. As discussed earlier, the Nova smoked salmon HACCP plan did not comply with FDA regulations and continues not to comply because (1) the plan is signed but not dated as required by 21 C.F.R. 123.6(d), (2) there is no critical limit for internal fish temperature required by 21 C.F.R. § 123.6(c)(4), no time was specified for thawing frozen fish, as required by 21 C.F.R. § 123.6(c)(2)(i), no procedure was included for monitoring brine solution or fish temperature during brining required by 21 C.F.R. § 123.6(c)(4), there was no procedure to check the accuracy of thermometers, Salometers, and thermostats required by 21 C.F.R. § 123.6(c)(4), and there was inadequate monitoring of critical control points, as required by 21 C.F.R. § 123.6(c)(7).

been construed to have its usual and ordinary meaning, and is not confined to any scientific or medical definition. *See United States v. Swift & Co.*, 53 F.Supp. 1018 (M.D.Ga.1943).

Some of the insanitary conditions observed during the course of the FDA and NYSDAM inspections since 1994 are detailed above. The defendants do not dispute that these conditions were observed and documented by the FDA and NYSDAM. The government has submitted a large bound volume of inspection reports going back as far as 1994 detailing recurring violations, laboratory results indicating the presence of L. monocytogenes in food products and the plant environment, press releases of Blue Ribbon recalls due to contaminated seafood, letters to Blue Ribbon corporate agents specifying insanitary conditions observed during inspections and warning that a seizure or injunction may result if the conditions are not rectified, and letters of assurances by Blue Ribbon agents that the insanitary conditions would be fixed.

Defendants do not deny that they have been processing seafood under insanitary conditions for the last seven years, but claim that these conditions have been rectified under Suttenberg's relatively new management of the plant presenting an issue of fact for a jury. Defendants' submit that since the January 2001 inspection, NYSDAM has tested Blue Ribbon's products for L. monocytogenes five times, have each time found no trace of the bacteria.

Defendants' "new management" defense does not present a material issue of fact for a jury with respect to the question of whether defendants' seafood products are adulterated. Whether Blue Ribbon has *finally* cleaned up its plant does not change the fact that between 1994 and the summer of this year the FDA and the NYSDAM documented critical deficiencies

in the plant's conditions and cleanliness, sufficient to establish as a matter of law that there is a reasonable possibility that the food has become filthy or injurious to health. Moreover, while Blue Ribbon may have not tested positive for the presence of L. monocytogenes since the January 2001 inspection, numerous inspections by the NYSDAM since then have revealed continued insanitary conditions at the plant. The March 12, 2001 inspection found a number of violations including: no handwash sign; unshielded light source; soiled fan guards; dust-laden vent cover; an unscreened entrance; an uneven, soiled floor; debris and litter on the floor; a damaged freezer door gasket; the accumulation of dark residues of air curtain to processing room; exposed fish in a freezer; a lack of thermometers in some retail display cases; and improper record-keeping of internal temperatures of processing fish. A subsequent inspection by NYSDAM on April 30, 2001, revealed a "critical deficiency" caused by the improper processing of Nova smoked bits. General deficiencies were also observed, such as: soiled doors; heavy ice accumulation in freezers; employees with no hair restraints; an unscreened entrance; and dead flies and a dead beetle. NYSDAM assessed Blue Ribbon a fine of $300. During a subsequent inspection on June 6, 2001, the day after the United States filed the present complaint, NYSDAM again found both critical and general deficiencies in the plant's operation and environment, including improper fish processing procedures, and insanitary plant conditions, including mouse droppings, cockroaches, live flies, debris, and refuse. Blue Ribbon was assessed a fine of $600. On these facts, as a matter of law, there is a reasonable possibility that Blue Ribbon's food has been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby

it may have been rendered injurious to health." 21 U.S.C. § 342(a)(4).

■ 3. *Presence of L. Monocytogenes.* The government argues that Blue Ribbon's seafood is adulterated because L. monocytogenes is a "poisonous or deleterious substance," the presence of which renders the seafood "injurious to health." 21 U.S.C. § 342(a)(1). If L. monocytogenes is an "added substance," according to the FDCA and the FDA's zero-tolerance policy, any trace of it in a food product renders that product adulterated. If L. monocytogenes is not an added substance, defendants' fish are adulterated only if the quantity of the bacteria *"ordinarily* render[s] it injurious to health." 21 U.S.C. § 342(a)(1) (emphasis added).

Defendants' argue first that L. monocytogenes is not an "added substance" and that, therefore, 21 U.S.C. § 342(a)(1) provides that food is not adulterated if it contains a quantity of L. monocytogenes not ordinarily injurious to health. Defendants argue alternatively that, if L. monocytogenes is an "added substance," the FDA's failure to set a "tolerance level" pursuant to 21 U.S.C. § 346 is a violation of the FDCA.

### Added Substance

■ The FDCA does not define the terms "added substance," but FDA regulations define the relevant terms as follows:

(c) A *naturally occurring poisonous or deleterious substance* is a poisonous or deleterious substance that is an inherent natural constituent of a food and is not the result of environmental, agricultural, industrial, or other contamination.

(d) An *added poisonous or deleterious substance* is a poisonous or deleterious substance that is not a naturally occurring poisonous or deleterious substance. When a naturally occurring poisonous or deleterious substance is increased to ab- normal levels through mishandling or other intervening acts, it is an added poisonous or deleterious substance to the extent of such increase.

21 C.F.R. § 109.3(c) & (d) (italics in original). Defendants argue that L. monocytogenes is not an added substance because it "occurs in seafood naturally in the wild." Defendants cite *United States v. 1232 Cases American Beauty Brand Oysters,* 43 F.Supp. 749 (W.D.Mo.1942), which held that fish bones and oyster shell fragments, while deleterious, were not artificially added substances. *Id.* at 750–51. Yet the defendants themselves submit evidence that readily distinguishes the occurrence of L. monocytogenes in fish and the occurrence of fish bones in fish. The UNFAO report submitted by defendants notes that fish are not born with L. monocytogenes but, rather, are contaminated with the bacteria by coming into contact with it in the environment. George W. Bierman, Ph.D., defendants' proposed expert, states that the "[FDA] and the Food Safety Inspection Service of the U.S. Department of Agriculture ("FSIS") have acknowledged that '[b]ecause *L. Monocytogenes* is widely present in the environment, it would be impossible to prevent animals from coming into contact with the bacteria' " and states that the same is true of raw fish. "Raw fish procured by processors are likely to have come into contact with the organism in the wild," Bierman concludes. L. monocytogenes is, thus, not an inherent natural constituent of fish but, rather, a bacterial organism present in the environment that comes into contact with, and contaminates, some fish. *See United States v. Union Cheese Co.,* 902 F.Supp. 778, 786 (N.D.Ohio 1995) (finding L. monocytogenes not to be an inherent natural constituent of cheese but rather the result of environmental contamination); *cf. United States v. An Article of Food Consisting of Cartons of Swordfish,* 395 F.Supp. 1184 (S.D.N.Y.

1975) (finding mercury to be an added substance because it does not occur naturally in swordfish).

 Even if L. monocytogenes existed naturally in fish, it would still be considered an "added substance" under the FDCA because the spread of the bacteria to other uncontaminated fish is "increased to abnormal levels through mishandling or other intervening acts" and is therefore considered an "added substance" under the FDA regulations. 21 C.F.R. § 109.3(b). Defendants do not dispute but rather advance the argument that L. monocytogenes contamination can be spread by intervening acts of man: "Contamination takes place not only in the wild, but on fishing boats or during filleting, or potentially anywhere else in the chain from ocean to fishing boat to trade to processor to wholesaler to retailer to consumer." Defendants do not dispute the insanitary conditions observed by the FDA and NYS-DAM going back as far as 1994. The government's expert, Losikoff, states without dispute that the conditions observed during the January 2001 inspection were such that could result in the cross-contamination of previously uncontaminated fish products, specifically, product residue on food contact surfaces, like the slicer and cutting boards; cutting boards and knives not sanitized before use as specified in the plant's sanitation procedures; cutting boards that were worn from use and gouged with nicks and scrapes making cleaning and sanitizing difficult; cooler and freezer door handles that were caked with residue; and plastic strips used as room-dividing curtains that touched the floor and were then allowed to drag across uncovered processed sea bass as the employee pulled a cart from one room to the next. Other employee practices observed constitute intervening acts increasing the amount of the bacteria in the plant's fish, like employees touching unclean surfaces then handling ready-to-eat fish, the lack of protective clothing over employee street clothes, and bare arms and beards. "Insanitary conditions, which are the intervening acts of humans, are sufficient grounds upon which to conclude that a deleterious substance has been 'added.'" *Union Cheese Co.*, 902 F.Supp. at 786; *see also Continental Seafoods, Inc. v. Schweiker*, 674 F.2d 38, 43 (D.C.Cir.1982) (affirming similar holding with respect to salmonella in shrimp). Accordingly, I conclude based on the undisputed facts that L. monocytogenes is an added substance under the FDCA.

*Injurious to Health*

 Defendants seek to raise a material and disputed issue of fact as to whether L. monocytogenes is a "poisonous or deleterious substance which may render [food] injurious to health," as required by 21 U.S.C. § 342(a)(1).

Defendants first state that "[t]he bacterium does not ordinarily present a risk to healthy individuals." (Bierman Decl. ¶ 87, 8; FDA, Center for Food Safety and Applied Nutrition, Foodborne Pathogens Microorganisms and Natural Toxins Handbook ("Bad Bug Book")). Defendants further note that "healthy people do not develop listeriosis except in extremely rare cases" and that "epidemiological studies showing a 1 in 59 million chance of infection from a 50 gram serving of fish containing 100 bacteria per gram" focus on the risk of disease to the population at large rather than to susceptible individuals such as the young, old, and pregnant. As to the susceptible population, the FDA's Bad Bug Book also states as of data from 1987 that "there are at least 1600 cases of listeriosis with 415 deaths per year in the U.S." and that "manifestations of listeriosis include septicemia, meningitis (or meningoencephalitis), encephalitis, and intra-

uterine or cervical infections in pregnant women, which may result in spontaneous abortion ... or stillbirth." An article submitted by defendants states that *"[l]isteria monocytogenes* causes listeriosis, a disease that can be serious and is often fatal to susceptible individuals.... Accordingly, regulatory agencies in the United States have adopted a zero-tolerance policy towards the incidence of the organism in ready-to-eat food products." M. Eklund *et al.*, U.S. Dept. of Commerce, NOAA, National Marine Fisheries Service, "Incidence and Sources of Listeria monocytogenes in Cold Smokes Fishery Products and Processing Plants," Journal of Food Protection, Vol. 58 (1995). The UNFAO report provided by defendants states that, "[r]ecognizing the potential for fishery products to be a vehicle for large outbreaks of listeriosis, it is prudent to seek appropriate strategies to minimize human exposure to infectious doses of [L. Monocytogenes]." United Nations Food and Agriculture Organization Fisheries Report No. 604. Another article provided by defendants states that "listeriosis is an atypical foodborne disease of major public health concern because of the severity and the nonenteric nature of the disease (meningitis, septicemia, and abortion), a high case-fatality rate (around 20 to 30% of cases), a frequently long incubation time, and a predilection for individuals who have underlying conditions which lead to impairment of T-cell-mediated immunity." J. Rocourt *et al.*, *Listeria Monocytogenes,*

from Food Microbiology Fundamentals and Frontiers (1997). The legal question posed by defendants' arguments is simply whether the substance must be deleterious to the entire population or simply to significant segments of the population such as the old, the young, and pregnant women. To pose the question is to answer it. Because L. monocytogenes is a poisonous or deleterious substance that may render Blue Ribbon's fish products injurious to the health of significant populations of consumers, such products are adulterated within the meaning of Section 342(a)(1) of the FDCA.

### Zero–Tolerance Policy

 Sections 342(a)(2)(A) and 346 of the FDCA provide that some added poisonous or added deleterious substances in food will not render the food adulterated if the quantity of the offending substance is below a "tolerance level" established by the FDA.[8] Defendants argue that the FDA's zero-tolerance policy violates the FDCA and that the FDA must promulgate minimum tolerance levels in recognition of the prevalence of L. monocytogenes in smoked fish plants and on cold-smoked fish products. Putting aside the fact that the government need not rely on a finding that the food is adulterated pursuant to Section 342(a)(2)(A), because it can show that the added substance is actually injurious to health and adulterated as per Section 342(a)(1), the defendants' argument is without merit. According to Section 346,[9]

---

**8.** Section 342(a)(2)(A) of the FDCA provides that a food shall be deemed adulterated "if it bears or contains any added poisonous or added deleterious substance (other than [exceptions not relevant here]) that is unsafe within the meaning of section 346 of this title." 21 U.S.C. § 342(a)(2)(A).

**9.** Section 346 of the FDCA states in full:

Any poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice shall be deemed to be unsafe for purposes of the application of clause (2)(A) of section 342(a) of this title; but when such substance is so required or cannot be so avoided, the Secretary shall promulgate regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of public health, and any quantity exceeding the lim-

"*[a]ny* quantity of added poisonous or added deleterious substance is ... "unsafe," *unless* the substance is required in food production or cannot be avoided by good manufacturing practice." *Young*, 476 U.S. at 977, 106 S.Ct. 2360 (emphasis in original). "For these latter substances, 'the Secretary shall promulgate regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of public health.'" *Id.* (citing 21 U.S.C. § 346). Since the enactment of the FDCA in 1938, "the FDA has interpreted this provision to give it the discretion to decide whether to promulgate a § 346 regulation, which is known in the administrative vernacular as a "tolerance level."" *Id.* The FDA is not required to promulgate a § 346 regulation to set a tolerance level for L. monocytogenes, and this Court is not permitted to second guess the agency's determination unless its decision is shown to be arbitrary and capricious and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"), which is not the case here.[10] *See United States v. Royal Baltic Ltd.*, No. 94–CV–1178 (E.D.N.Y. Oct. 3, 2001) (finding that the FDA has the discretion not to set a tolerance level for L. monocytogenes).

Furthermore, the defendants' own evidence belies the assertion that it would be impossible to produce contamination-free cold-smoked products. Bierman, defendants' expert, points to a number of positive advancements in the smoked fish industry that, if properly implemented, significantly decrease the incidence of L. monocytogenes, specifically, the development and implementation of adequate HACCP plans, strict monitoring of the firm's fish processing procedures and sanitation, and the testing of raw materials before they are allowed to enter and contaminate the plant. It is a matter of undisputed fact that the defendants have failed time and time again to take these necessary precautions.

There is no factual dispute that defendants have violated Section 331(a) and (k) of the FDCA by introducing into interstate commerce food that is adulterated or by causing food to become adulterated after its introduction into interstate commerce.

*Jurisdiction to Enter Permanent Injunction*

The FDCA expressly authorizes district courts to grant injunctive re-

---

its so fixed shall also be deemed to be unsafe for purposes of the application of clause (2)(A) of section 342(a) of this title. While such a regulation is in effect limiting the quantity of any such substance in the case of any food, such food shall not, by reason of bearing or containing any added amount of such substance, be considered to be adulterated within the meaning of clause (1) of section 342(a) of this title. In determining the quantity of such added substance to be tolerated in or on different articles of food the Secretary shall take into account the extent to which the use of such substance is required or cannot be avoided in the production of each article, and the other ways in which the consumer may be affected by the same or other poisonous or deleterious substances.

21 U.S.C. § 346.

**10.** The APA provides that an agency action may be overturned only if it is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Although the Court may consider whether the agency has made a clear error of judgment, the Court "is not empowered to substitute its own judgment for that of the agency." *Id.* at 377, 109 S.Ct. 1851. Moreover, "[a] reviewing court must generally be at its most deferential when the determination is guided by the agency's scientific expertise, unless the agency's views have no basis in fact or are irrational." *Henley v. FDA*, 77 F.3d 616, 620 (2d Cir.1996). Here, defendants have not demonstrated that the FDA's policy is without basis in fact or is irrational.

lief to enforce its provisions. 21 U.S.C. § 332(a).[11] Where the government is enforcing a statute designed to protect the public interest, it is not required to show irreparable harm to obtain injunctive relief. *United States v. Diapulse Corp. of America,* 457 F.2d 25, 27–28 (2d Cir.1972); *United States v. Schmitt,* 734 F.Supp. 1035, 1049 (E.D.N.Y.1990). The statute's enactment constitutes Congress' "implied finding that violations will harm the public and ought, if necessary, be restrained." *Diapulse Corp.,* 457 F.2d at 28 (citing *United States v. City and County of San Francisco,* 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940)). To enjoin future behavior, the government must show that defendants have violated the FDCA and that there is some reasonable likelihood that the violations may recur. *See Diapulse Corp.,* 457 F.2d at 28–29; *Schmitt,* 734 F.Supp. at 1049. The probability of future violations may be inferred from past unlawful conduct. *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 560 F.2d 135, 144 (2d Cir.1977); *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 176 (9th Cir.1987).

As established above, the evidence shows that the defendants have violated the FDCA by distributing adulterated seafood on a continued basis throughout the years. Their behavior has persisted despite a series of inspections, warnings from the state and federal government, the temporary revocation of their license by NYS-DAM, and a number of monetary fines. Given the extent and numerosity of past warnings to Blue Ribbon and its agents, defendants cannot satisfy the burden to establish that "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

 The defendants oppose the substance and form of the government's proposed permanent injunction on basically two grounds. First, defendants argue that the effect of the permanent injunction will be to shut down Blue Ribbon, causing its eleven employees, including the three defendants, to lose their jobs. The injunction, however, will not require Blue Ribbon to stop processing fish but, rather, to stop processing fish that is or has become adulterated. The Second Circuit has held that a business may not complain "that the injunction is impermissible because it will put him out of business." *Diapulse Corp.,* 457 F.2d at 29. A business " 'can have no vested interest in a business activity found to be illegal.' " *Id.* (citing *United States v. Walsh,* 331 U.S. 432, 67 S.Ct. 1283, 91 L.Ed. 1585 (1947)).[12] Second, defendants argue that the proposed injunction would "empower [the] FDA to micro-manage Blue Ribbon's facility" and that they should not have to pay for FDA inspections to ensure their compliance with the injunction or hire an outside consultant to monitor food safety. These objections to the proposed injunction do not merit an alteration of its terms. These terms of the proposed injunction, including the responsibility for costs and monitoring by outside consultants, have been routinely accepted and imposed by other courts faced with similar proof of FDCA violations. *See, e.g., United States v. Syntrax Innovations, Inc.,* 149 F.Supp.2d 880, 882–891 (E.D.Mo.

---

11. Section 332(a) of Title 21 states in full that "[t]he district courts of the United States and the United States courts of the Territories shall have jurisdiction, for cause shown[,] to restrain violations of section 331 of this title."

12. In addition, it is noted that the government is not seeking a harsher remedy, like criminal penalties, pursuant to 21 U.S.C. § 333, or seizure of defendants' products, pursuant to 21 U.S.C. § 334.

2001) (granting government's motion on summary judgment for misbranding in violation of the FDCA and imposing permanent injunction providing for very similar terms); *United States v. Union Cheese Co.,* 902 F.Supp. 778, 787–90 (N.D.Ohio 1995) (granting preliminary injunction against cheese factory due to presence of L. monocytogenes with almost precisely the same terms). I recognize that this Court's equitable powers "should be exercise in harmony with the overall objectives of the legislation," *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1219 (7th Cir.1979), and that the FDCA's "overriding purpose [is] to protect the public health." *United States v. Article of Drug, Bacto–Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969). By keeping contaminated fish processed under conditions of filth off consumers' tables, this permanent injunction will serve that important purpose.

## CONCLUSION

The individual defendants' motion to dismiss the complaint against them is denied. The government's motion for summary judgment is granted. The government is directed to settle a judgment on notice within thirty days of the date of this decision.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.